William R. Coleman v. Commissioner. W. Bryan Jordan v. Commissioner. Edmund W. Turnley v. Commissioner. White Hall Morrison, Jr. v. Commissioner. William Lipscomb Davis v. Commissioner.
Coleman v. Commissioner
Docket Nos. 34604-34608.
United States Tax Court
T.C. Memo 1954-24; 1954 Tax Ct. Memo LEXIS 225; 13 T.C.M. (CCH) 419; T.C.M. (RIA) 54130; April 30, 1954, Filed *225 A partnership composed of the wives of petitioners held to be a bona fide one. Reber Boult, Esq., James I. Vance Berry, Esq., and Thomas M. McIntyre, C.P.A., 919 Third National Bank Building, Nashville, Tenn., for the petitioners. Homer F. Benson, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: These proceedings, consolidated for hearing and opinion, involve deficiencies determined by respondent in the income taxes of the petitioners in the amounts and for the calendar years as follows: Year
Amount
William R. Coleman
1944
$ 8,904.02
1945
8,793.08
W. Bryan Jordan
1944
8,943.89
1945
7,797.30
Edmund W. Turnley
1944
5,250.10
1945
8,738.96
1946
7,482.67
1947
42.07
White Hall Morrison, Jr.
1944
9,656.56
1945
13,814.09
1946
9,372.64
1947
37.87
William Lipscomb Davis
1944
4,706.45
1945
14,928.66
1946
18,611.39
1947
203.41
The sole question involved is whether the Morrison Novelty Company, composed of the wives of the petitioners, was a bona fide partnership, for federal income tax purposes. Respondent has determined that the income reported in *226 the income tax returns of their wives as being attributable to their wives' interests in the Morrison Novelty Company was the earned income of the petitioners, respectively, and as such taxable to petitioners rather than their wives. Certain minor issues raised in the petitions were expressly waived by petitioners at the hearing. Findings of Fact William R. Coleman is a resident of Smyrna, Rutherford County, Tennessee, and is the husband of Nell Earl Coleman. In 1943 he was a full-time partner with W. Bryan Jordan in Smyrna Lumber Company. W. Bryan Jordan is presently a resident of San Antonio, Texas. In 1943, 1944, and until August 1945, he resided in Smyrna, Tennessee, where he was engaged as a fulltime partner with William R. Coleman in the Smyrna Lumber Company. His wife at that time was Dixie Owen Jordan. They were divorced in August 1945. Edmund W. Turnley is a resident of Nashville, Davidson County, Tennessee, and is the husband of Lula T. Turnley. In 1943 he was a stockholder, director and treasurer of Davis Cabinet Company. For many years prior to 1943, as well as thereafter, including the taxable years involved, he owned a one-half partnership in Nashville Chair Company *227 and its branch offices in Knoxville, and Chattanooga, Tennessee, under the name of Wholesale Furniture and Appliance Company, dealers at wholesale in furniture and home appliances. He was managing partner engaged full-time in the business affairs of that partnership. White Hall Morrison, Jr., is a resident of Nashville, Tennessee, and is the husband of Louise S. Morrison. In 1943 he was a stockholder, but not an officer or director, of Davis Cabinet Company. In the latter part of 1943 he was engaged in trying to get his business affairs in order preparatory to joining the armed forces of the United States. He volunteered in March 1944 and was on active duty until October 1945. William Lipscomb Davis is a resident of Nashville, Tennessee, and is the husband of Adelaide S. Davis. He is a stockholder, and since 1932 has been president and operating head of the Davis Cabinet Company. All five of the above named petitioners filed their separate individual income tax returns for each of the taxable years involved with the collector of internal revenue for the district of Tennessee, at Nashville, Tennessee. Davis Cabinet Company is a Tennessee corporation in existence for many years *228 prior to 1943. Its business has been and continues to be the manufacture of solid wood bedroom furniture. It had no other manufactured product and, except for the two contracts hereinafter mentioned, one with Gun Stock Division - Smyrna Lumber Company and one with Morrison Novelty Company, engaged in no other business. In the latter part of 1943, its stockholders consisted of: Mrs. Anne Haley Davis (deceased - estate under administration) Mrs. Lula T. Turnley W. H. Morrison, Jr. Rogers H. Morrison W. H. Morrison, Sr. W. Lipscomb Davis E. W. Turnley Mrs. Sarah H. Morrison At no time were W. Bryan Jordan and William R. Coleman stockholders in Davis Cabinet Company, nor did their wives ever have any interest in that company. Smyrna Lumber Company, a partnership composed of W. Bryan Jordan and William R. Coleman, had been in business many years prior to 1943. It dealt principally in hardwood lumber, buying lumber from many sources and operating at least one sawmill in Smyrna, Tennessee. Gun Stock Division - Smyrna Lumber Company (hereinafter referred to as Gun Stock Division) was a partnership composed of W. B. Jordan, W. R. Coleman, E. W. Turnley, W. H. Morrison, *229 Jr., and W. L. Davis. Gun Stock Division had contracts with various manufacturers under which it furnished gun stock blanks to be used by such manufacturers in the manufacture of gun stocks for the Armed Forces of the United States. A gun stock blank in its final form was in the general outline of a gun stock but with no shaping, no cutting or notching, and with its original sharp corners. The Gun Stock Division partnership had a contract with Davis Cabinet Company whereby Davis Cabinet Company received raw, sawmill cut walnut lumber or flitch (thick, sawmill cut boards with the bark still on) from the Gun Stock Division and cut gun stock blanks according to blueprints thereof. Gun stock blanks were the sole product of Gun Stock Division. If a blank was found defective it was cut down to a smaller blank and if still defective was discarded and in many cases used for firewood. It was not used for making toy guns. The gun stock blanks were shipped to the gun stock manufacturers in their unfinished, square-cut, raw condition. Gun Stock Division's contracts with the gun stock manufacturers had all the usual wartime provisions, including provisions for expediting, inspection and renegotiation. *230 Gun Stock Division had no financial or business relations of any character with the Morrison Novelty Company. Gun Stock Division ceased operations in the fall of 1944 and was formally dissolved May 31, 1945. Morrison Novelty Company was a partnership, its principal business being the manufacture and sale of wooden toy guns modeled after guns used by the Armed Forces of the United States and manufactured out of gun stock rejects obtained from the various manufacturers of walnut gun stocks. As first organized on December 15, 1943, it was composed of Nell Earl Coleman, Dixie Owen Jordan, Louise S. Morrison, Lula T. Turnley and Adelaide S. Davis, who signed the first partnership agreement on that date. The first three each contributed $500 of the capital and owned a 25 percent interest; the latter two each contributed $250 of the capital and owned a 12 1/2 per cent interest. They were the wives of petitioners herein and their interests in Morrison Novelty Company corresponded to their husbands' interests in Gun Stock Division - Smyrna Lumber Company. Each of the above named partners in Morrison Novelty Company was possessed of a substantial net estate of her own separate and apart from *231 that of her husband. As of March 31, 1945, Mrs. Coleman sold her interest to Mrs. Davis and Mrs. Jordan sold her interest to Herbert N. Jordan, whereupon the original partnership was formally dissolved and a new partnership agreement dated April 1, 1945, was signed by Mrs. Davis, Mrs. Turnley, Mrs. Morrison and Herbert N. Jordan. On May 31, 1945, Herbert N. Jordan sold one-half of his one-fourth interest to Rogers H. Morrison and the other one-half of his one-fourth interest to Edmund W. Turnley, Jr., whereupon the second partnership in the Morrison Novelty Company was formally dissolved and a third partnership agreement, dated June 1, 1945, was signed by Mrs. Davis, Mrs. Morrison, Mrs. Turnley, Rogers H. Morrison, and Edmund W. Turnley, Jr. The later partnership continued until May 31, 1952, when it was formally dissolved. The idea for the manufacture of toy guns out of rejected walnut gun stocks, which finally resulted in the organization of the Morrison Novelty Company apparently grew by accident. Some of the rejected gun stocks had been sent by the manufacturers to the Davis Cabinet Company for the information of its officers as to the causes of the rejection and the purpose *232 of cutting them down into smaller blanks. Someone attached an imitation wooden barrel and trigger and several of the officials carried them hom for their children to play with. From these circumstances the idea developed for the manufacture and sale of toy wooden guns out of rejected gun stocks. Consideration was given by the stockholders and officers of the Davis Cabinet Company to the Davis Cabinet Company going into the business of manufacturing and selling such toy guns, but some of them, particularly W. H. Morrison, Sr., who was one of its principal stockholders, strenuously objected for fear it might adversely affect the splendid reputation which that company had bedroom furniture. Consideration was also given to the manufacture and sale of such toy guns by the Gun Stock Division - Smyrna Lumber Company. However, after consultation with their accountant, this idea was also abandoned because of the possible complications it might have with respect to that Company's wartime contracts, particularly with respect to inspection and renegotiations. Thereupon the petitioners approached their wives with the idea of the latter forming a company to manufacture and sell toy wooden guns. *233 Having seen the effect of such toys on their own and neighborhood children, the wives thought well of the idea and readily agreed to invest some of their own money in the venture. At that time none of the petitioners or their wives anticipated the tremendous success which the business would have, but thought of it as a means by which the wives might acquire a little extra spending money of their own. Each of the partnership agreements provided that J. Carl Cooper should act as manager and J. W. Moore as assistant manager of Morrison Novelty Company in return for compensation previously agreed upon (in the amount of $50 per month for each). All checks on the bank account of the Morrison Novelty Company were to be signed and countersigned by Cooper and Moore as manager and assistant manager, respectively. Both Cooper and Moore were regular employees of Davis Cabinet Company and the officers of that company agreed that Cooper and Moore could perform the services for Morrison Novelty Company provided it did not interfere with their duties to the Davis Cabinet Company and their work for Morrison Novelty Company was performed outside the hours of their employment by Davis Cabinet Company. *234 Separate books, accounts, and records were kept for Morrison Novelty Company by Cooper and Moore at the offices of the Davis Cabinet Company. Cooper also maintained the records of Gun Stock Division at the same address but received no additional compensation therefor. As set up, the business of the Morrison Novelty Company required little, if any, personal services on the part of the individual partners. Nor were any services performed for Morrison Novelty Company by any of the petitioners except such as were required by and incident to the orders for reject gun stocks which Morrison placed with Smyrna Lumber Company and the contract hereinafter mentioned which it had with Davis Cabinet Company. Cooper and Moore attended to all administration duties, including accounting functions, preparation of financial statements and reports, partnership returns, the bank account and distribution of profits. They were the only employees except for a brief period when two other men were employed, one to purchase lumber for making gun barrels and triggers, and another to supervise some work in the Davis Cabinet Company plant. Reject gun stocks were purchased from the manufacturers through Smyrna *235 Lumber Company. When needed orders would be placed with Smyrna. Smyrna bought them from the gun stock manufacturers, had them shipped to the Davis Cabinet Company plant and billed Morrison Novelty Company, which paid Smyrna in cash except on one occasion when Morrison gave Smyrna its 90-day note in the amount of $27,555.49, which it paid off in full with interest. Morrison Novelty Company also entered into a contract with Davis Cabinet Company whereby the latter converted the reject gun stocks into toys by attaching a wooden barrel, trigger, etc., and also packaged and shipped them to the purchasers. At that time, due to the slump in its own business of making solid wood bedroom furniture, brought about by reason of wartime restrictions, this contract was very beneficial to Davis Cabinet Company, both in furnishing work for its employees and financially. Its cost amounted to approximately 45" per toy gun and it received, at first 75", later increased to 80", and then 85" per toy gun, from Morrison Novelty Company. The gross amount paid by Morrison Novelty Company to Davis Cabinet Company for all services performed by it under the contract was $252,276.60, and represented a very substantial *236 profit to Davis Cabinet Company. Sales of the toy guns were handled through the same salesmen who sold Davis Cabinet Company's bedroom furniture. Such salesmen were employed on a commission basis, both by Davis Cabinet Company and by Morrison Novelty Company. Davis Cabinet Company paid them nothing for the services they performed for Morrison Novelty Company. This arrangement was likewise beneficial to such salesmen because of the slump in Davis Cabinet Company's business. In all its reports to governmental agencies, both state and federal, and its dealings with the business public, Morrison Novelty Company operated and held itself out as a separate business entity composed of the partners who signed the respective partnership agreements. The operations of Morrison Novelty Company were very profitable. For the respective fiscal periods involved of the three successive partnerships, all known as Morrison Novelty Company, the partners' profits were as follows: FIRST PARTNERSHIP - December 15, 1943, to
March 31, 1945.
Mrs. Adelaide S. Davis
$13,054.71
Mrs. Lula T. Turnley
13,054.71
Mrs. Louise S. Morrison
26,109.38
Mrs. Nell E. Coleman
26,109.38
Mrs. Dixie Owen Jordan
26,109.38
SECOND PARTNERSHIP - April 1, 1945, to
May 31, 1945.
Mrs. Adelaide S. Davis
$15,095.40
Mrs. Lula T. Turnley
5,031.77
Mrs. Louise S. Morrison
10,063.60
Herbert N. Jordan
10,063.60
THIRD PARTNERSHIP - June 1, 1945 to May
31, 1952.
Mrs. Adelaide S. Davis
$48,067.39
Mrs. Lula T. Turnley
16,022.49
Mrs. Louise S. Morrison
32,044.92
Edmund W. Turnley, Jr.
16,022.49
Rogers H. Morrison
16,022.49
*237 Each of the partners of Morrison Novelty Company, as shown by the partnership agreements, received distribution of profits according to her respective interest from time to time. Each of said partners reported this income for federal income tax purposes and paid the tax thereon. None of the profits from Morrison Novelty Company were received by any of the petitioners and none of such profits was reported in their income tax returns. Opinion This case differs from the usual family partnership situation in that there is here no question of members of a family purporting to be partners. Here five women, wives of the petitioners, entered into a partnership agreement. Respondent contends that this partnership arrangement was a sham and that the income received therefrom was in fact the income of the petitioners, apparently because the petitioners were associated together in another business partnership, The Gun Stock Division - Smyrna Lumber Company, and the wives' interests in Morrison Novelty Company were in the same proportion as petitioners' interests in Gun Stock Division, also, that the idea for the formation of the Morrison Novelty Company originated with petitioners, that *238 the capital contributed by the wives was small in comparison to the amount of business engaged in, and that the wives contributed no personal services. We have detailed at length the circumstances which gave rise to the formation of Morrison Novelty Company, as well as the interrelated business activities of all the parties and concerns involved, and we can find no basis whatever for concluding that the Morrison Novelty Company was not a bona fide partnership and that the income received therefrom was not the income of the parties who signed the partnership agreements. We think the facts speak for themselves and it would serve no useful purpose to repeat them here. The controlling test as laid down by the Supreme Court in , is whether "* * * considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good *239 faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Applying that test to the facts before us we have no difficulty in concluding that a valid, bona fide partnership was intended and created among the wives of the petitioners. The wives agreed to and did enter the toy gun business. The fact that their husbands suggested, or encouraged them to enter into such a business, of itself, does not render the partnership arrangement invalid. We know of no authority which would prevent a husband from recommending or suggesting a business enterprise to his wife, or which would render invalid the wife's entry into such enterprise upon his advice and recommendation. The original capital was contributed by the wives, each of whom was possessed of a separate estate and income therefrom which was amply sufficient, if need be, to furnish additional capital. The fact that Smyrna Lumber Company extended credit to Morrison Novelty Company in the amount of $27,555.49 does not alter the fact that the partnership capital was contributed by the wives. The note was repaid in full with 4 per cent interest. The loan was therefore a profitable one for *240 Smyrna. No one of the petitioners furnished any capital to Morrison Novelty Company and no one of them administratively supervised Morrison Novelty Company or performed any substantial services for it except as required by and incident to valid contracts which Morrison Novelty Company had with other separate business entities of which he was a partner, stockholder, or officer. It is not even suggested that the contracts between Morrison Novelty Company and Smyrna Lumber Company for the procurement of reject gun stocks and with Davis Cabinet Company to convert these reject gun stocks into toy wooden guns were not beneficial and profitable to such companies. The profit which Smyrna Lumber Company received for acting as agent in the procurement of reject gun stocks has not been shown. However, it affirmatively appears that the profit which Davis Cabinet Company made out of its contract with Morrison Novelty Company was very substantial. Even if it be conceded that the wives lacked the experience and managerial abilities to personally supervise the physical operation of the business this is not sufficient to render the partnership arrangement invalid. As stated in : *241 "Every owner of a business, particularly those of limited business experience, has the undoubted right to have it managed by another, even though that person be married to the owner." Here the manager and assistant manager, selected by the wives to perform all the administrative functions of the business, were not married to any of the owners. The fact that they were also employees of companies in which the husbands were interested is also immaterial. All of the duties which they performed for Morrison Novelty Company were performed outside the hours of their employment by Davis Cabinet Company. Finally, no one of the petitioners received any of the proceeds from the profits of the Morrison Novelty Company. After careful consideration of all the evidence and testimony, we are of the opinion that Morrison Novelty Company was a valid and bona fide partnership composed of the wives of petitioners herein, and that the income therefrom was properly attributable to such wives. It follows that the distributive profits of Morrison Novelty Company were not taxable to petitioners. Certain adjustments in the Notices of Deficiencies were either not contested, or error having been assigned thereto *242 in their pleadings, were waived by petitioners at the hearing and on brief. *
Decisions will be entered under Rule 50. *
Footnotes
*. As amended by Tax Court order dated June 1, 1954.↩
*. As amended by Tax Court order dated June 1, 1954.↩